# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 25, 2013        Decided May 28, 2013

No. 12-1337

COMCAST CABLE COMMUNICATIONS, LLC,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

THE TENNIS CHANNEL, INC.,
INTERVENOR

———

On Petition for Review of an Order
of the Federal Communications Commission

———

*Miguel A. Estrada* argued the cause for petitioners. With
him on the briefs were *Erik R. Zimmerman* and *Lynn R.
Charytan*.

*H. Bartow Farr III*, *Rick Chessen*, *Neal M. Goldberg*, *Michael S. Schooler*, and *Diane B. Burstein* were on the brief for *amicus curiae* The National Cable & Telecommunications Association in support of petitioner.

*Peter Karanijia*, Deputy General Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Catherine G. O'Sullivan* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Sean A. Lev*, General Counsel, Federal Communications Commission, *Jacob M. Lewis*, Associate General Counsel, and *Laurel R. Bergold*, Counsel. *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission*,* and *James M. Carr* and *C. Grey Pash Jr.*, Counsel, entered appearances.

*Robert A. Long Jr.* argued the cause for intervenor. With him on the brief were *Stephen A. Weiswasser* and *Mark W. Mosier*.

*Markham C. Erickson* was on the brief for *amicus curiae* Bloomberg L.P. in support of respondent.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

Concurring opinion filed by *Circuit Judge* KAVANAUGH.

Concurring opinion filed by *Senior Circuit Judge* EDWARDS.

WILLIAMS, *Senior Circuit Judge*: Regulations of the Federal Communications Commission, adopted under the mandate of § 616 of the Communications Act of 1934 and

virtually duplicating its language, bar a multichannel video programming distributor ("MVPD") such as a cable company from discriminating against unaffiliated programming networks in decisions about content distribution. More specifically, the regulations bar such conduct when the effect of the discrimination is to "unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly." 47 C.F.R. § 76.1301(c); see also 47 U.S.C. § 536(a)(3). Tennis Channel, a sports programming network and intervenor in this suit, filed a complaint against petitioner Comcast Cable, an MVPD, alleging that Comcast violated § 616 and the Commission's regulations by refusing to broadcast Tennis as widely (i.e., via the same relatively low-priced "tier") as it did its own affiliated sports programming networks, Golf Channel and Versus. (Versus is now known as NBC Sports Network and was originally called Outdoor Life Network; for consistency with the order under review, we refer to it as "Versus.") An administrative law judge ruled against Comcast, ordering that it provide Tennis carriage equal to what it affords Golf and Versus, and the Commission affirmed. See *Tennis Channel, Inc. v. Comcast Cable Commc'ns, LLC*, Memorandum Opinion and Order, 27 FCC Rcd. 8508, 2012 WL 3039209 (July 24, 2012) ("Order").

Comcast's arguments on appeal are, broadly speaking, threefold. First, it contends that Tennis's complaint was untimely filed under 47 C.F.R. § 76.1302(h), given the meaning that the Commission apparently assigned that section when it last modified its language. See *In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992*, 9 FCC Rcd. 4415, ¶ 24, 1994 WL 414309 (Aug. 5, 1994). Judge Edwards's concurring opinion addresses that issue. The panel need not do so, as the limitations period doesn't constitute a jurisdictional barrier. And as Judge Edwards notes, the Commission has launched a rulemaking apparently aimed in part at clearing up the confusion he

identifies. *In re Revision of the Commission's Program Carriage Rules*, 26 FCC Rcd. 11494, 11522-23, ¶¶ 38-39, 2011 WL 3279328 (Aug. 1, 2011).

Second, Comcast poses a number of issues as to the meaning of § 616, including an argument that the Commission reads it so broadly as to violate Comcast's free speech rights under the First Amendment. We need not reach those issues, as Comcast prevails with its third set of arguments—that even under the Commission's interpretation of § 616 (the correctness of which we assume for purposes of this decision), the Commission has failed to identify adequate evidence of unlawful discrimination.

Many arguments within this third set involve complex and at least potentially sophisticated disputes. See, e.g., Order ¶¶ 71-74 (relating to calculation of "penetration rates" for purposes of determining whether Comcast treated Tennis more or less favorably than did other MVPDs and of measuring the degree of harm caused by any such difference). But Comcast also argued that the Commission could not lawfully find discrimination because Tennis offered no evidence that its rejected proposal would have afforded Comcast *any* benefit. If this is correct, as we conclude below, the Commission has nothing to refute Comcast's contention that its rejection of Tennis's proposal was simply "a straight up financial analysis," as one of its executives put it. Joint Appendix ("J.A.") 300.

\* \* \*

Comcast, the largest MVPD in the United States, offers cable television programming to its subscribers in several different distribution "tiers," or packages of programming services, at different prices. Since Versus's and Golf's launches in 1995, Comcast—which originally had a minority

interest in the two networks, and now has 100% ownership—has generally carried the networks on its most broadly distributed tiers, Expanded Basic or the digital counterpart Digital Starter. Order ¶ 12; J.A. 1223-24.

Tennis Channel, launched in 2003, initially sought distribution of its content on Comcast's less broadly distributed sports tier, a package of 10 to 15 sports networks that Comcast's subscribers can access for an extra $5 to $8 per month. In 2005, Tennis entered a carriage contract that gave the Comcast the "right to carry" Tennis "on any . . . tier of service," subject to exclusions irrelevant here. Comcast in fact placed Tennis on the sports tier.

In 2009, however, Tennis approached Comcast with proposals that Comcast reposition Tennis onto a tier with broader distribution. Order ¶¶ 12, 33. Tennis's proposed agreement called for Comcast to pay Tennis for distribution on a per-subscriber basis. Tennis provided a detailed analysis—which is sealed in this proceeding—of what Comcast would likely pay for that broader distribution; even with the discounts that Tennis offered, the amounts are substantial. Neither the analysis provided at the time, nor testimony received in this litigation, made (much less substantiated) projections of any resulting increase in revenue for Comcast, let alone revenue sufficient to offset the increased fees.

Comcast entertained the proposal, checking with "division and system employees to gauge local and subscriber interest." J.A. 402. After those consultations, and based on previous analyses of interest in Tennis, Comcast rejected the proposal in June 2009. Tennis then filed its complaint with the Commission in January 2010, which led to the order now under review. By way of remedy, the ALJ ordered, and the Commission affirmed, that Comcast must "carry [Tennis] on

the same distribution tier, reaching the same number of subscribers, as it does [Golf] and Versus." Order ¶ 92.

The parties agree that Comcast distributes the content of affiliates Golf and Versus more broadly than it does that of Tennis. The question is whether that difference violates § 616 and the implementing regulations. There is also no dispute that the statute prohibits only discrimination *based on* affiliation. Thus, if the MVPD treats vendors differently based on a reasonable business purpose (obviously excluding any purpose to illegitimately hobble the competition from Tennis), there is no violation. The Commission has so interpreted the statute, *Mid-Atlantic Sports Network v. Time Warner Cable Inc.*, 25 FCC Rcd. 18099, ¶ 22 (2010), and the Commission's attorney conceded as much at oral argument, see Oral Arg. Tr. at 24-25; see also *TCR Sports Broad. Holding L.L.P. v. FCC*, 679 F.3d 269, 274-77 (4th Cir. 2012) (discussing the legitimate, non-discriminatory reasons for an MVPD's differential treatment of a non-affiliated network).

In contrast with the detailed, concrete explanation of Comcast's additional costs under the proposed tier change, Tennis showed no corresponding benefits that would accrue to Comcast by its accepting the change. Testimony from one of Comcast's executives identifies some of the factors it considers when deciding whether to move a channel to broader distribution:

> In deciding whether to carry a network and at what cost, Comcast Cable must balance the costs and benefits associated with a wide range of factors, including: the amount of the licensing fees (which is generally the most important factor); the nature of the programming content involved; the intensity and size of the fan base for that content; the level of service sought by the

> network; the network's carriage on other MVPDs; the extent of [most favored nation][1] protection provided; the term of the contract sought; and a variety of other operational issues.

J.A. 408, ¶ 32. Of course the record is very strong on the proposed increment in licensing fees, in itself a clear negative. The question is whether the other factors, and perhaps ones unmentioned by Comcast, establish reason to expect a net benefit.

But neither Tennis nor the Commission offers such an analysis on either a qualitative or a quantitative basis. Instead, the best the Commission offers, both in the Order and at oral argument, is that Tennis charges less per "rating point" than does either Golf or Versus. Order ¶ 78 n.243; Oral Arg. Tr. at 25-29. But those differentials are not affirmative evidence that acceptance of Tennis's 2009 proposal could have offered Comcast any net gain. Even if we were to assume arguendo that low charges per ratings point are the be-all and the end-all of assigning a network to a broadly accessible tier (and the record does not support such an assumption), the cost-per-ratings-point evidence would at most show that (by this particular criterion) Tennis's gross cost is not as high as that of either Golf or Versus. It does not show any affirmative net benefit. As to the assumption about cost per ratings point, the sealed record suggests (consistent with Comcast's evidence about the factors guiding its tier placement decisions) that a very high price per rating point is by no means an absolute barrier to placement in a broadly available tier. J.A. 51, 1112.

---

[1] A "most favored nation" provision grants the distributor "the right to be offered any more favorable rates, terms, or conditions subsequently offered or granted by a network to another distributor." J.A. 1376.

In the absence of evidence that the lower cost per ratings point is correlated with changes in revenues to offset the proposed cost increase for Tennis's broader distribution, the discussion of cost per ratings point is mere handwaving.

A rather obvious type of proof would have been expert evidence to the effect that X number of subscribers would switch to Comcast if it carried Tennis more broadly, or that Y number would leave Comcast in the absence of broader carriage, or a combination of the two, such that Comcast would recoup the proposed increment in cost. There is no such evidence. (Conceivably Tennis could have shown that the incremental losses from carrying Tennis in a broad tier would be the same as or less than the incremental losses Comcast was incurring from carrying Golf and Versus in such tiers. The parties do not even hint at this possibility, nor analyze its implications.)

Not only does the record lack affirmative evidence along these lines, there is evidence that no such benefits exist. After Tennis proposed the broader distribution of its content on Comcast's network, Comcast executives surveyed employees in various geographic divisions to gauge interest in the proposal. The executive in charge of the northern division reported that there was "[n]o interest whatsoever" in moving Tennis to a broader distribution, J.A. 349, because there had never been "a request or a complaint to move Tennis Channel to a more available tier," *id.* at 350. Perhaps more telling is the natural experiment conducted in Comcast's southern division. There Comcast had in 2007 or 2008 acquired a distribution network from another MVPD that had distributed Tennis more broadly than did Comcast. When Comcast repositioned Tennis to the sports tier (a "negative repo" in MVPD lingo), thereby making it available to Comcast's general subscribers only for an additional fee, not one customer complained about the change.

When we asked at oral argument about the absence of evidence of benefit to Comcast from the proposed tier change, Commission counsel pointed not to any such evidence but to the ALJ's remedy (affirmed by the Commission), which gave Comcast the alternative of narrowing the exposure of Golf and Versus (rather than broadening that of Tennis). Such a change was the Commission's alternative remedy for bringing the three networks to tiering parity. But the discriminatory act alleged by the Commission was Comcast's refusal to broaden its distribution of Tennis, not a refusal to narrow its distribution of Golf and Versus. The latter may make complete sense in terms of providing an evenhanded remedy. But evidence that such a change would have afforded Comcast a net benefit—for example, by generating incremental sports tier fees exceeding incremental losses from the removal of Golf and Versus from lower priced tiers— would in itself have little bearing on the lawfulness of Comcast's rejection of Tennis's actual proposal to extend distribution of the latter's content. It is thus unsurprising that no one organized data to test the profitability of this hypothetical tiering change.

This is not to say that the record lacks evidence of important *similarities* between Tennis on the one hand and Golf and Versus on the other. See, e.g., Order ¶¶ 51-55. If accompanied by evidence that (assuming Golf and Versus had been on the sports tier at the time of Tennis's proposal in 2009) a shift of them to broader coverage would have yielded incremental revenue equivalent to what Tennis demanded in 2009, the comparative data might have done the job. But no such evidence was offered.

Neither Tennis nor the Commission has invoked the concept that an otherwise valid business consideration is here merely pretextual cover for some deeper discriminatory purpose. Instead, both Tennis and the Commission challenge

Comcast's cost-benefit analysis as insufficiently rigorous. While Tennis and the Commission both label that analysis "pretextual," see Tennis Br. at 18; Resp'ts' Br. at 31, their actual claim is that the cost-benefit analysis was too hastily performed to justify Comcast's rejection of Tennis's proposal, thus supporting an inference that discrimination was the true motive. In light of the evidence surveyed above, and the lack of evidence from which one might infer any net benefit, Comcast's haste is irrelevant.

We note that the FCC's Media Bureau found that Tennis had established a *prima facie* case and that the Commission assumed without deciding that in those circumstances Tennis retained the burden of proof throughout the proceeding. Order ¶ 38. We will assume arguendo, in favor of the Commission, that the Media Bureau was correct in its finding of a *prima facie* case and that in those circumstances it could shift the burden to the respondent. But that assumption is of no use to the Commission where the record simply lacks material evidence that the Tennis proposal offered Comcast any commercial benefit.

Without showing any benefit for Comcast from incurring the additional fees for assigning Tennis a more advantageous tier, the Commission has not provided evidence that Comcast discriminated against Tennis on the basis of affiliation. And while the Commission describes at length the "substantial evidence" that supports a finding that the discrimination is based on affiliation, Resp'ts' Br. at 25-31, none of that evidence establishes benefits that Comcast would receive if it distributed Tennis more broadly. On this issue the Commission has pointed to no evidence, and therefore obviously not to substantial evidence. See *Guardian Moving & Storage Co., Inc. v. ICC*, 952 F.2d 1428, 1433 (D.C. Cir. 1992).

11

\* \* \*

The petition is therefore

*Granted.*

KAVANAUGH, *Circuit Judge*, concurring: Video programming distributors such as Comcast deliver video programming networks to consumers. Under Section 616 of the Communications Act, a video programming distributor may not discriminate against an unaffiliated programming network in a way that "unreasonably restrain[s]" the unaffiliated network's ability to compete fairly. Applying that statute in this case, the FCC found that Comcast discriminated against the unaffiliated Tennis Channel network by refusing to carry that network on the same cable tier that Comcast carries its affiliated Golf Channel and Versus networks. The FCC also found that the discrimination unreasonably restrained the Tennis Channel's ability to compete fairly. As a remedy, the FCC ordered Comcast to carry the Tennis Channel on the same tier that it carries the Golf Channel and Versus.

As the Court's opinion explains, the FCC erred in concluding that Comcast discriminated against the Tennis Channel on the basis of affiliation. I join the Court's opinion in full. I write separately to point out that the FCC also erred in a more fundamental way. Section 616's use of the phrase "unreasonably restrain" – an antitrust term of art – establishes that the statute applies only to discrimination that amounts to an unreasonable restraint under antitrust law. Vertical integration and vertical contracts – for example, between a video programming distributor and a video programming network – become potentially problematic under antitrust law only when a company has market power in the relevant market. It follows that Section 616 applies only when a video programming distributor possesses market power. But Comcast does not have market power in the national video programming distribution market, the relevant market analyzed by the FCC in this case. Therefore, as I will explain in Part I of this opinion, Section 616 does not apply here.

Applying Section 616 to a video programming distributor that lacks market power not only contravenes the terms of the statute, but also violates the First Amendment as it has been interpreted by the Supreme Court. As I will explain in Part II of this opinion, the canon of constitutional avoidance thus strongly reinforces the conclusion that Section 616 applies only when a video programming distributor possesses market power.

I

Section 616 of the Communications Act requires the FCC to:

> prevent a multichannel video programming distributor from engaging in conduct the effect of which is to *unreasonably restrain* the ability of an unaffiliated video programming vendor to compete fairly by discriminating in video programming distribution on the basis of affiliation or nonaffiliation of vendors in the selection, terms, or conditions for carriage of video programming provided by such vendors.

47 U.S.C. § 536(a)(3) (emphasis added); *see* 47 C.F.R. § 76.1301(c). The statutory text establishes that a Section 616 violation has two elements. First, the video programming distributor must have discriminated against an unaffiliated video programming network on the basis of affiliation. Second, the video programming distributor's discrimination must have "unreasonably restrain[ed]" the unaffiliated network's ability "to compete fairly."

Congress enacted Section 616 (over the veto of President George H.W. Bush) as part of the Cable Television Consumer Protection and Competition Act of 1992, known as the Cable

Act. The Cable Act included numerous provisions designed to curb abuses of cable operators' bottleneck monopoly power and to promote competition in the cable television industry. When the Act was passed, however, the video programming market looked quite different than it looks today. At the time, most households subscribed to cable in order to view television programming. And as Congress noted, "most cable television subscribers [had] no opportunity to select between competing cable systems." Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, § 2(a)(2), 106 Stat. 1460, 1460 (1992). Congress decided to proactively counteract the bottleneck monopoly power that cable operators possessed in many local markets.

The Cable Act employs a variety of tools to advance competition. Some provisions directly prohibit practices that Congress viewed as anticompetitive in the market at the time. For example, the Act prohibits local franchising authorities from granting exclusive franchises to cable operators. *See id.* § 7(a), 106 Stat. at 1483. Similarly, the Act's "must-carry" provisions require cable operators to carry a specified number of local broadcast stations. *See id.* § 4, 106 Stat. at 1471.

In other parts of the Act, Congress borrowed from antitrust law, authorizing the FCC to regulate cable operators' conduct in accordance with antitrust principles. For example, the Act requires the FCC, when prescribing limits on the number of cable subscribers or affiliated channels, to take account of "the nature and market power of the local franchise." *See id.* § 11(c), 106 Stat. at 1488. Similarly, the Act allows rate regulation only of those cable systems that are not subject to effective competition. *See id.* § 3, 106 Stat. at 1464.

The provision at issue in this case, Section 616, incorporates traditional antitrust principles. Section 616 does not categorically forbid a video programming distributor from extending preferential treatment to affiliated video programming networks or lesser treatment to unaffiliated video programming networks. Rather, to violate Section 616, a video programming distributor must discriminate among video programming networks on the basis of affiliation, *and* the discrimination must "unreasonably restrain" an unaffiliated network's ability to compete fairly. 47 U.S.C. § 536(a)(3).

The phrase "unreasonably restrain" is of course a longstanding term of art in antitrust law. *See, e.g.*, *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007) ("[T]he Court has repeated time and again that § 1 outlaws only unreasonable restraints.") (internal quotation marks and alteration omitted); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized that Congress intended to outlaw only unreasonable restraints."); *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988) ("Since the earliest decisions of this Court interpreting [Section 1 of the Sherman Act], we have recognized that it was intended to prohibit only unreasonable restraints of trade.").

When a statute uses a term of art from a specific field of law, we presume that Congress adopted "the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *FAA v. Cooper*, 132 S. Ct. 1441, 1449 (2012) (internal quotation mark omitted); *see also Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health and Human Resources*, 532 U.S. 598,

615 (2001) (Scalia, J., concurring) ("Words that have acquired a specialized meaning in the legal context must be accorded their *legal* meaning."); *McDermott International, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) ("In the absence of contrary indication, we assume that when a statute uses such a term [of art], Congress intended it to have its established meaning."); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("[A]bsence of contrary direction may be taken as satisfaction with widely accepted definitions, not as a departure from them."); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 73 (2012) (where "a word is obviously transplanted from another legal source, . . . it brings the old soil with it") (internal quotation mark omitted); *cf. FTC v. Phoebe Putney Health System, Inc.*, 133 S. Ct. 1003, 1015 (2013) (reading statute "in light of our national policy favoring competition").

From the "term of art" canon and Section 616's use of the antitrust term of art "unreasonably restrain," it follows that Section 616 incorporates antitrust principles governing unreasonable restraints.

So what does antitrust law tell us? In antitrust law, certain activities are considered per se anticompetitive. Otherwise, however, conduct generally can be considered unreasonable only if a firm, or multiple firms acting in concert, have market power. *See Leegin Creative Leather Products*, 551 U.S. at 885-86; *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775 (1984); *see also Standard Oil Co. v. United States*, 283 U.S. 163, 179 (1931).

This case involves vertical integration and vertical contracts. Beginning in the 1970s (well before the 1992 Cable Act), the Supreme Court has recognized the legitimacy

of vertical integration and vertical contracts by firms without market power. *See, e.g.*, *Leegin Creative Leather Products*, 551 U.S. 877; *State Oil Co.*, 522 U.S. 3; *Business Electronics*, 485 U.S. 717; *Continental T. V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36 (1977). Vertical integration and vertical contracts become potentially problematic only when a firm has market power in the relevant market. That's because, absent market power, vertical integration and vertical contracts are *procompetitive*. Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies – and thus reduce prices and lead to better goods and services for consumers. *See* Douglas H. Ginsburg, *Vertical Restraints: De Facto Legality Under the Rule of Reason*, 60 ANTITRUST L.J. 67, 76 (1991) ("Antitrust law is a bar to the use of vertical restraints only in markets in which there is no apparent interbrand competition to protect consumers from a potentially welfare-decreasing restraint on intrabrand competition."); Dennis L. Weisman & Robert B. Kulick, *Price Discrimination, Two-Sided Markets, and Net Neutrality Regulation*, 13 TUL. J. TECH. & INTELL. PROP. 81, 99 (2010) ("[M]onopoly power in one market is a necessary condition for anticompetitive effects in almost all models of anticompetitive vertical integration."); *see also* 3B PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 756a, at 9 (3d ed. 2008) (vertical integration "is either competitively neutral or affirmatively desirable because it promotes efficiency"); ROBERT H. BORK, THE ANTITRUST PARADOX 226 (1978) ("vertical integration is indispensable to the realization of productive efficiencies").

Not surprisingly given its procompetitive characteristics, vertical integration and vertical contracts are common and accepted practices in the American economy: Apple's

iPhones contain integrated hardware and software, Dunkin' Donuts sells Dunkin' Donuts coffee, Ford produces radiators for its cars, McDonalds sells Big Macs, Nike stores are stocked with Nike shoes, Netflix owns "House of Cards," and so on. As Professors Areeda and Hovenkamp have explained, vertical integration "is ubiquitous in our economy and virtually never poses a threat to competition when undertaken unilaterally and in competitive markets." 3B AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 755c, at 6.

Following the lead of the Supreme Court and influential academic literature on which the Supreme Court has relied in the antitrust field, this Court's case law has stated that vertical integration and vertical contracts are procompetitive, at least absent market power. *See Cablevision Systems Corp. v. FCC*, 649 F.3d 695, 721 (D.C. Cir. 2011) (vertical integration is "not always pernicious and, depending on market conditions, may actually be procompetitive"); *National Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831, 840 (D.C. Cir. 2006) ("We began by emphasizing that vertical integration creates efficiencies for consumers."); *Tenneco Gas v. FERC*, 969 F.2d 1187, 1201 (D.C. Cir. 1992) ("[A]dvantages a pipeline gives its affiliate are improper only to the extent that they flow from the pipeline's anti-competitive market power. Otherwise vertical integration produces permissible efficiencies that cannot by themselves be considered uses of monopoly power.") (internal quotation marks omitted); *see also Cablevision Systems Corp. v. FCC*, 597 F.3d 1306, 1325 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) ("At least unless a company possesses market power in the relevant market, vertical integration and exclusive vertical contracts are not anti-competitive; on the contrary, such arrangements are 'presumptively procompetitive.'") (quoting 11 HERBERT HOVENKAMP, ANTITRUST LAW ¶ 1803, at 100 (2d ed. 2005)).

Now back to Section 616: Because Section 616 incorporates antitrust principles and because antitrust law holds that vertical integration and vertical contracts are potentially problematic only when a firm has market power in the relevant market, it follows that Section 616 applies only when a video programming distributor has market power in the relevant market.[1] Section 616 thus does not bar vertical integration or vertical contracts that favor affiliated video programming networks, absent a showing that the video programming distributor at least has market power in the relevant market. To conclude otherwise would require us to depart from the established meaning of the term of art "unreasonably restrain" that Section 616 uses. Moreover, to conclude otherwise would require us to believe that Congress intended to *thwart* procompetitive practices. It would of course make little sense to attribute that motivation to Congress.

How, then, did the FCC reach the opposite conclusion in this case? The short answer is that the FCC badly misread the statute. Contrary to the plain language of Section 616, the FCC stated that the term "unreasonably" modified "discriminating" not "restrain" – even though Section 616

---

[1] Section 616 and the Cable Act provisions that incorporate antitrust principles are not merely redundant of antitrust law. To be sure, the Federal Trade Commission and the U.S. Department of Justice Antitrust Division enforce federal antitrust laws, and private citizens may bring civil antitrust suits as well. But in the Cable Act, Congress authorized a separate enforcement agency, the FCC, to regulate certain practices of cable operators. For that reason, even Cable Act provisions such as Section 616 that mirror existing antitrust proscriptions serve an important regulatory purpose, akin to adding new police officers to enforce an existing law.

says it applies only to discriminatory conduct that "unreasonably restrain[s]" the ability of a competitor to compete fairly. *See* Order ¶¶ 43, 85-86. Because the FCC did not read Section 616 as written, it did not recognize the antitrust term of art "unreasonably restrain" that is apparent on the face of the statute. That erroneous reading of the text, in turn, led the FCC to mistakenly focus on the effects of Comcast's conduct on a competitor (the Tennis Channel) rather than on overall competition. *See id.* ¶¶ 83-85.[2] That was a mistake because the goal of antitrust law (and thus of Section 616) is to promote consumer welfare by protecting competition, not by protecting individual competitors. *See, e.g.*, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (Sherman Act plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"); *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993) ("The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market."); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) ("The antitrust laws . . . were enacted for the protection of *competition*, not *competitors*.") (internal quotation marks omitted); *see also* AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 755c, at 6 ("[E]ven competitively harmless vertical integration can injure rivals or vertically related firms, but such injuries are not the concern of the antitrust laws.").

It is true that Section 616 references discrimination against competitors. But again, the statute does not ban such

_____

[2] Because the FCC's Order never actually interpreted the phrase "unreasonably restrain," we would have to remand even if we thought Section 616 reasonably could be applied to video programming distributors without market power. *See SEC v. Chenery Corp.*, 318 U.S. 80 (1943).

discrimination outright. It bans discrimination that *unreasonably restrains* a competitor from competing fairly. By using the phrase "unreasonably restrain," the statute incorporates an antitrust term of art, and that term of art requires that the discrimination in question hinder overall competition, not just competitors.

In sum, Section 616 targets instances of preferential program carriage that are anticompetitive under the antitrust laws. Section 616 thus may apply only when a video programming distributor possesses market power in the relevant market. Comcast has only about a 24% market share in the national video programming distribution market; it does not possess market power in the market considered by the FCC in this case. *See* Order ¶ 87.[3] Therefore, the FCC erred in finding that Comcast violated Section 616.

## II

To the extent there is uncertainty about whether the phrase "unreasonably restrain" in Section 616 means that the statute applies only in cases of market power or instead may have a broader reach, we must construe the statute to avoid "serious constitutional concerns." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 577 (1988); *see also Solid Waste Agency of Northern Cook County v. Army Corps of Engineers*, 531 U.S. 159, 172 (2001).[4] That canon strongly

---

[3] In some local geographic markets around the country, a video programming distributor may have market power. This case does not call upon us to consider how Section 616 would apply to discrimination against unaffiliated networks in such local markets.

[4] There is some debate about how serious the statute's constitutional questions must be, and indeed whether the statute

supports limiting Section 616 to cases of market power. Applying Section 616 to a video programming distributor that lacks market power would raise serious First Amendment questions under the Supreme Court's case law. Indeed, applying Section 616 to a video programming distributor that lacks market power would violate the First Amendment as it has been interpreted by the Supreme Court.

To begin with, the Supreme Court has squarely held that a video programming distributor such as Comcast both engages in and transmits speech, and is therefore protected by the First Amendment. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 636 (1994). Just as a newspaper exercises editorial discretion over which articles to run, a video programming distributor exercises editorial discretion over which video programming networks to carry and at what level of carriage.

It is true that, under the Supreme Court's precedents, Section 616's impact on a cable operator's editorial control is content-neutral and thus triggers only intermediate scrutiny rather than strict scrutiny. *See id.* at 642-43. But the Supreme Court's case law applying intermediate scrutiny in this context provides that the Government may interfere with a video programming distributor's editorial discretion only when the video programming distributor possesses market power in the relevant market.

---

otherwise must be unconstitutional, for the avoidance doctrine to apply. *See generally* Richard A. Posner, *Statutory Interpretation – in the Classroom and in the Courtroom*, 50 U. CHI. L. REV. 800, 816 (1983) (criticizing the avoidance doctrine as a "judge-made constitutional 'penumbra'"). That debate is irrelevant to my analysis here because I have concluded that it would indeed be unconstitutional to apply Section 616 absent market power.

In its 1994 decision in *Turner Broadcasting*, the Supreme Court ruled that the Cable Act's must-carry provisions might satisfy intermediate First Amendment scrutiny, but the Court rested that conclusion on "special characteristics of the cable medium: the bottleneck monopoly power exercised by cable operators and the dangers this power poses to the viability of broadcast television." *Id.* at 661. When a cable operator has bottleneck power, the Court explained, it can "silence the voice of competing speakers with a mere flick of the switch." *Id.* at 656. In subsequently upholding the must-carry provisions, the Court reiterated that cable's bottleneck monopoly power was critical to the First Amendment calculus. *See Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 197-207 (1997) (controlling opinion of Kennedy, J.).[5] The Court stated that "cable operators possess[ed] a local monopoly over cable households," with only one percent of communities being served by more than one cable operator. *Id.* at 197.

In 1996, when this Court upheld the Cable Act's exclusive-contract provisions against a First Amendment challenge, we likewise pointed to the "special characteristics" of the cable industry. *See Time Warner Entertainment Co. v. FCC*, 93 F.3d 957 (D.C. Cir. 1996). Essential to our decision were "both the bottleneck monopoly power exercised by cable operators and the unique power that vertically integrated

---

[5] In the 1997 *Turner Broadcasting* case, Justice Kennedy's opinion represented the "position taken by those Members who concurred in the judgment[] on the narrowest grounds." *See Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation mark omitted). That opinion's evaluation of anticompetitive behavior and the significance of bottleneck power analytically lay between that of Justice Breyer's concurring opinion on the one hand and the dissent on the other.

companies have in the cable market." *Id.* at 978 (internal quotation marks and citation omitted).

But in the 16 years since the last of those cases was decided, the video programming distribution market has changed dramatically, especially with the rapid growth of satellite and Internet providers. This Court has previously described the massive transformation, explaining that cable operators "no longer have the bottleneck power over programming that concerned the Congress in 1992." *Comcast Corp. v. FCC*, 579 F.3d 1, 8 (D.C. Cir. 2009); *see also Cablevision Systems Corp. v. FCC*, 597 F.3d 1306, 1324 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) ("This radically changed and highly competitive marketplace – where no cable operator exercises market power in the downstream or upstream markets and no national video programming network is so powerful as to dominate the programming market – completely eviscerates the justification we relied on in *Time Warner* for the ban on exclusive contracts."); Christopher S. Yoo, *Vertical Integration and Media Regulation in the New Economy*, 19 YALE J. ON REG. 171, 229 (2002) ("It thus appears that the national market for MVPDs is already too unconcentrated to support the conclusion that vertical integration could have any anti-competitive effects.").

In today's highly competitive market, neither Comcast nor any other video programming distributor possesses market power in the national video programming distribution market. To be sure, beyond an interest in policing anticompetitive behavior, the FCC may think it preferable simply as a communications policy matter to equalize or enhance the voices of various entertainment and sports networks such as the Tennis Channel. But as the Supreme Court stated in one of the most important sentences in First

Amendment history, "the concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48-49 (1976).

Therefore, under these circumstances, the FCC cannot tell Comcast how to exercise its editorial discretion about what networks to carry any more than the Government can tell Amazon or Politics and Prose or Barnes & Noble what books to sell; or tell the *Wall Street Journal* or *Politico* or the *Drudge Report* what columns to carry; or tell the MLB Network or ESPN or CBS what games to show; or tell *SCOTUSblog* or *How Appealing* or *The Volokh Conspiracy* what legal briefs to feature.

In light of the Supreme Court's precedents interpreting the First Amendment and the massive changes to the video programming distribution market over the last two decades, the FCC's interference with Comcast's editorial discretion cannot stand. In restricting the editorial discretion of video programming distributors, the FCC cannot continue to implement a regulatory model premised on a 1990s snapshot of the cable market.

The Supreme Court's precedents amply demonstrate that the FCC's interpretation of Section 616 violates the First Amendment. At a minimum, the Supreme Court's precedents raise serious First Amendment questions about the FCC's interpretation of Section 616. Under the constitutional avoidance canon, those serious constitutional questions require that we construe Section 616 to apply only when a video programming distributor possesses market power.

15

\* \* \*

The FCC erred in concluding that Section 616 may apply to a video programming distributor without market power. For that reason, in addition to the reasons given by the Court, the FCC's Order cannot stand.

EDWARDS, *Senior Circuit Judge*, concurring: I concur in Judge Williams' cogent opinion for the court. It is clear from the record that, even accepting the FCC's interpretation of Section 616, there is no substantial evidence of unlawful discrimination to support the Commission's decision in this case. I write separately because I believe that Tennis Channel's complaint was untimely filed under the applicable statute of limitations encoded in 47 C.F.R. § 76.1302(f) (2010). I would rest on this ground alone if the statute of limitations requirements were jurisdictional, but they are not. Nonetheless, the issues raised by the statute of limitations issue are, in my view, very important because they highlight the agency's failure to give fair notice to regulated parties of the rules governing the filing of complaints under Section 616. And, as explained below, the FCC's current interpretation of subsection 76.1302(f)(3) is not only incomprehensible but it fails to credit the sanctity of the parties' contractual commitments. Hopefully, these matters will be addressed in the FCC's pending rulemaking. *See In re Revision of the Commission's Program Carriage Rules*, Notice of Proposed Rulemaking, 26 FCC Rcd. 11494, 11522-23, ¶¶ 38-39, 2011 WL 3279328 (Aug. 1, 2011).

———————————

As explained in the opinion for the court, this case involves a complaint filed in 2010 by Tennis Channel, a sports programming network, with the Federal Communications Commission ("FCC" or "Commission") against Comcast Cable Communications, LLC ("Comcast"), a multichannel video programming distributor ("MVPD"). The complaint alleged that Comcast had discriminated against Tennis Channel, in violation of Section 616 of the Communications Act of 1934, 47 U.S.C. § 536(a)(3), when it declined to distribute Tennis Channel as broadly as Golf Channel and Versus, sports networks owned by Comcast.

After launching in 2003, Tennis Channel sought carriage on Comcast's "Sports Tier," a package of sports networks that are accessible to Comcast subscribers for an added fee. Tennis Channel and Comcast executed a carriage contract in 2005 pursuant to which Comcast retained unfettered authority to distribute Tennis Channel on any tier. Comcast elected to carry Tennis Channel on its Sports Tier. At the time when Tennis Channel entered into its contract with Comcast, Golf Channel and Versus were affiliated with Comcast and both networks were carried on more broadly distributed tiers. In 2006 and 2007, Tennis Channel offered Comcast and other MVPDs equity in exchange for broader carriage. Comcast and several other MVPDs declined. In 2009, Tennis Channel again asked Comcast to move it to a tier with broader distribution than the Sports Tier. The two parties discussed the possibility. After unproductive discussions, Tennis Channel broke off negotiations. In the end, Comcast (and other MVPDs as well) rejected Tennis Channel's requests for broader carriage. In 2010, all major MVPDs – including Tennis Channel's partial owners, DirecTV and Dish Network – distributed Tennis Channel less broadly than Golf Channel and Versus.

After Comcast elected to stand on its contract rights and declined to distribute Tennis Channel more broadly, Tennis Channel filed a carriage complaint against Comcast under Section 616. The complaint alleged that Comcast discriminated against Tennis Channel on the basis of affiliation by distributing it more narrowly than Golf Channel and Versus. The Commission's Media Bureau rejected Comcast's statute-of-limitations defense on the pleadings and set the matter for a hearing before an Administrative Law Judge ("ALJ"). The ALJ issued an Initial Decision finding that Comcast had violated Section 616. In a 3-2 split decision, the FCC upheld the Media Bureau's denial of Comcast's statute of limitations defense and affirmed the ALJ's

judgment on the merits against Comcast. *See Tennis Channel, Inc. v. Comcast Cable Commc'ns, LLC* ("*Order*"), Memorandum Opinion and Order, 27 FCC Rcd. 8508, 2012 WL 3039209 (July 24, 2012).

In its petition for review, Comcast raises three principal claims. First, Comcast contends that Tennis Channel's complaint should have been dismissed as untimely. Second, Comcast argues that the Commission's Order misconstrues and misapplies Section 616. Finally, Comcast contends that the FCC's Order violates the First Amendment because it impermissibly regulates Comcast's speech based on its content. I will focus solely on the first contention, i.e., that Tennis Channel's complaint was filed out of time.

FCC regulations state that "[a]ny complaint . . . must be filed within one year of the date on which . . . (1) The multichannel video programming distributor enters into a contract with a video programming distributor that a party alleges to violate one or more of the rules contained in this section." 47 C.F.R. § 76.1302(f)(1) (2010). Tennis Channel entered into its contract with Comcast in 2005; however, it did not file a complaint until 2010 – long after the one-year limitations period had expired. As Comcast notes, "[t]he parties' contract allows Comcast to carry Tennis Channel on any tier that Comcast chooses. By seeking an order that compels Comcast to carry it more broadly, Tennis Channel is attempting to rewrite the terms of the contract. Permitting Tennis Channel to reopen the limitations period for that contract-based claim at any time – simply by making a pretextual demand for broader carriage – would . . . directly contradict the entire purpose of the statute of limitations." Br. for Pet'r at 58-59. I agree.

The FCC's Order says that the applicable limitations period is governed by 47 C.F.R. § 76.1302(f)(3), which states that "[a]ny complaint . . . must be filed within one year of the

date on which . . . (3) A party has notified a multichannel video programming distributor that it intends to file a complaint with the Commission based on violations of one or more of the rules contained in this section." According to the FCC, Tennis Channel's complaint was timely under (f)(3) because Tennis Channel filed it "within one year of notifying Comcast of its intent to do so." *Order*, 27 FCC Rcd. at 8520 ¶ 30. I can find no merit in this position. As Comcast properly observes, the FCC's "approach not only rewrites the statute of limitations, but also *nullifies* it by allowing a party to a carriage contract to bring suit at any time." Br. for Pet'r at 58.

Tennis Channel's complaint seeks to modify the terms of the parties' contract by demanding that Comcast move it to a tier with broader distribution. Tennis Channel has no right under the contract to pursue this demand and Comcast has no obligation to accede to it. Tennis Channel's complaint thus raises a claim that the contract provisions giving Comcast unfettered authority to determine whether to carry Tennis Channel on its Sports Tier or some other tier violate Section 616. Therefore, under subsection (f)(1), Tennis Channel had one year from the date of contract formation to file its complaint. Because Tennis Channel's 2010 complaint was filed well beyond a year after contract formation, the complaint was time-barred. The FCC's purported application of subsection (f)(3), in lieu of subsection (f)(1), flies in the face of the Commission's longstanding interpretation of 47 C.F.R. § 76.1302(f). The FCC has repeatedly explained that subsection (f)(3) applies only in cases where an MVPD denies or refuses to acknowledge a request to negotiate for carriage, which is not what happened in this case. The FCC was not free to simply abandon its longstanding construction of subsection (f)(3) without notice-and-comment rulemaking. *Alaska Prof'l Hunters Ass'n, Inc. v. FAA*, 177 F.3d 1030, 1033-36 (D.C. Cir. 1999); s*ee also Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012) (holding that

agencies must provide "fair warning of the conduct a regulation prohibits or requires").

## I. Background

### A. The Statutory and Regulatory Framework

The Cable Television Consumer Protection and Competition Act of 1992, PUB. L. NO. 102-385, § 12, 106 Stat. 1460, 1488 (1992), added Section 616 to the Communications Act of 1934. Section 616 requires the FCC to issue regulations "to prevent [an MVPD] from engaging in conduct the effect of which is to unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly by discriminating in video programming distribution on the basis of affiliation or nonaffiliation of vendors in the selection, terms, or conditions for carriage." 47 U.S.C. § 536(a)(3). The Commission's regulations define "affiliated" as an MVPD "ha[ving] an attributable interest" in the network. 47 C.F.R. § 76.1300(a)-(b). As noted above, the regulations also establish a statute of limitations for Section 616 complaints. The applicable regulations state:

> (f) *Time limit on filing of complaints.* Any complaint filed pursuant to this subsection must be filed within one year of the date on which one of the following events occurs:
>
> (1) The multichannel video programming distributor enters into a contract with a video programming distributor that a party alleges to violate one or more of the rules contained in this section; or
>
> (2) The multichannel video programming distributor offers to carry the video programming vendor's programming pursuant to terms that a party alleges to violate one or more of the rules contained in this section, and such offer to carry programming is

unrelated to any existing contract between the complainant and the multichannel video programming distributor; or

(3) A party has notified a multichannel video programming distributor that it intends to file a complaint with the Commission based on violations of one or more of the rules contained in this section.

47 C.F.R. § 76.1302(f). The FCC recodified subsection 76.1302(f) as subsection 76.1302(h) in 2012 without any substantive change. For the sake of consistency with the parties' briefing and the FCC's Order, I will refer to subsection 76.1302(f).

## B. Facts and Procedural History

Comcast is the largest MVPD in the United States. It offers cable television programming to its subscribers in several different distribution "tiers" – i.e., packages of programming services – at different prices. Core programming is contained in Comcast's "Expanded Basic Tier," or its digital counterpart, the "Digital Starter Tier," which are its mostly widely distributed tiers. The more expensive "Digital Preferred Tier" provides customers with access to additional networks and is Comcast's second most widely-distributed tier. Comcast's Sports and Entertainment Package ("Sports Tier") consists of a package of sports-related networks and is available to Comcast subscribers for an additional fee. The Sports Tier is not as widely distributed as the Expanded Basic, Digital Starter, and Digital Preferred tiers.

Golf Channel and Versus are cable sports networks that were launched in 1995. Versus was known as the Outdoor Life Network when it launched and is now known as NBC Sports Network. (For the sake of consistency with the parties'

briefing and the FCC's Order, I will refer to the network as Versus.) Golf Channel provides coverage of golf tournaments and other golf-related programming. Versus provides coverage of numerous sports, including hockey, college football and basketball, lacrosse, hunting, and fishing. Both networks paid substantial sums beginning in 1995 to induce MVPDs, including Comcast, to distribute them broadly. Both networks are generally carried on Comcast's Digital Starter or Expanded Basic tiers. Comcast owned a minority interest in Golf Channel and Versus when they launched in 1995 and subsequently became the controlling owner of both networks.

Tennis Channel, a network that provides tennis-related programming, launched in 2003. The evidence in the record indicates that, by that time, "it was more difficult for new networks to obtain broad distribution than in 1995 because the associated costs for cable operators had increased and because competition from satellite and telephone providers had reduced cable operators' ability to absorb those costs." Br. for Pet'r at 7 (citing Joint Appendix 422-25, 519-22). In 2005, Tennis Channel and Comcast entered into a carriage contract reserving to Comcast the right to choose on which tier to carry the network. Comcast chose to carry, and still carries, Tennis Channel on its Sports Tier. Tennis Channel negotiated agreements with other MVPDs that granted similar rights with respect to the network's level of carriage.

In 2006 and 2007, Tennis Channel offered Comcast and other MVPDs equity in exchange for broader carriage. Two satellite companies – DirecTV and Dish Network – accepted that offer, became partial owners of Tennis Channel, and increased their distribution of the network. But Comcast and at least one other MVPD declined the offer. In 2009, Tennis Channel presented Comcast with two proposals for broader distribution on Comcast's Digital Starter or Digital Preferred tiers. Comcast argues that it saw no economic benefit in

Tennis Channel's proposals, and Tennis Channel broke off negotiations in June 2009. Tennis Channel's tier placement position vis-à-vis Golf Channel and Versus was the same in 2010 as it had been in 2005 when Comcast and Tennis Channel executed their carriage contract. Indeed, as noted above, in 2010, all major MVPDs – including DirecTV and Dish Network – distributed Golf Channel and Versus more broadly than Tennis Channel.

In December 2009, Tennis Channel notified Comcast of its intent to file a Section 616 complaint. In January 2010, Tennis Channel filed its complaint asserting that it was

> necessitated by Comcast's discriminatory refusal to provide Tennis Channel with the broader carriage that it provides to the similarly situated sports networks it owns (such as the Golf Channel and Versus) and that is otherwise appropriate in light of Tennis Channel's quality and performance.

Compl. at i. The FCC's Media Bureau rejected Comcast's argument that the complaint was time-barred and referred to the matter to an ALJ. *The Tennis Channel, Inc. v. Comcast Cable Commc'ns LLC*, Hearing Designation Order, 25 FCC Rcd. 14149, 2010 WL 3907080 (Oct. 5, 2010). After a six-day hearing, the ALJ found that Comcast had violated Section 616 and ordered Comcast to carry Tennis Channel "at the same level of distribution" as Golf Channel and Versus. *Tennis Channel, Inc. v. Comcast Cable Commc'ns, LLC*, Initial Decision, 26 FCC Rcd. 17160, 2011 WL 6416431 (Dec. 20, 2011). Comcast appealed to the full Commission, which ruled 3-2 to reject Comcast's statute-of-limitations defense and uphold most of the ALJ's decision. *Tennis Channel, Inc. v. Comcast Cable Commc'ns, LLC*, ("*Order*"), Memorandum Opinion and Order, 27 FCC Rcd. 8508, 2012 WL 3039209 (July 24, 2012). After Comcast filed a petition

for review with this court, we granted its motion to stay the Order pending our final decision in this case.

## II. Analysis

The parties agree that Tennis Channel's complaint must be dismissed if it was untimely. Comcast contends that the complaint should have been dismissed pursuant to 47 C.F.R. § 76.1302(f)(1). The FCC, however, concluded that the applicable statute of limitations was governed by 47 C.F.R. § 76.1302(f)(3). *Order*, 27 FCC Rcd. at 8519-22 ¶¶ 28-34. The agency found that Tennis Channel's complaint was timely because it was filed in January 2010, one month after Tennis Channel notified Comcast of its intent to file and seven months after Comcast declined Tennis Channel's demand to relocate to a different distribution tier. *Id.* at 8519-20 ¶ 30 & n.105.

Comcast is right that the FCC's application of the statute of limitations in this case cannot be reconciled with the agency's original and consistent view that subsection (f)(3) only applies where a "defendant unreasonably refuses to negotiate [for carriage] with [a] complainant." *1998 Biennial Regulatory Review – Part 76 – Cable Television Service Pleading and Complaint Rules* ("*1999 Order on Reconsideration*"), Order on Reconsideration, 14 FCC Rcd. 16433, 16435 ¶ 5, 1999 WL 766253 (Sept. 29, 1999). The FCC concedes that Tennis Channel's complaint is time-barred under this interpretation of the rule. *See* Br. for Resp'ts at 64 ("[T]he rule as originally promulgated was limited to denials or to refusals to negotiate for carriage . . . ."). The Commission has never properly amended the statute of limitations regulations to embrace the interpretation that it now advances. It is therefore clear that Tennis Channel filed its complaint out of time.

## A. Standard of Review

The governing law makes it plain that this court owes no deference to the Commission's current interpretation of 47 C.F.R. § 76.1302(f)(3). A court "must defer to [an agency's] interpretation [of a regulation] unless an alternative reading is compelled by . . . indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). An agency's interpretation of its own regulation is entitled to no deference if it has, "under the guise of interpreting a regulation, [created] *de facto* a new regulation," *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000), or subjected a party to "unfair surprise," *Christopher*, 132 S. Ct. at 2166-70. *See also Akzo Nobel Salt, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 212 F.3d 1301, 1304-05 (D.C. Cir. 2000) (holding that deference is inappropriate when the agency "flip-flops," offering a litigation position that differs from interpretations previously adopted by the agency, or when the agency offers contradictory interpretations on appeal). If an agency's present interpretation of a regulation would essentially amend the contested regulation, then the modification can only be made in accordance with the notice and comment requirements of the APA. *Alaska Prof'l Hunters*, 177 F.3d at 1033-36.

## B. The Applicable Statute of Limitations

### 1. *Regulatory History of the Statute of Limitations*

The FCC promulgated the statute of limitations for Section 616 complaints in 1993, pursuant to notice-and-comment rulemaking, as part of its original implementation of Section 616. *See Implementation of Sections 12 and 19 of the Cable Television Consumer Protection and Competition Act of 1992 – Development of Competition and Diversity in Video Programming Distribution and Carriage*, Second Report and

11

Order, 9 FCC Rcd. 2642, 2652-53 ¶ 25, 1993 WL 433631 (Oct. 22, 1993). Subsection (f)(3), as originally promulgated, read as follows:

> Any complaint filed pursuant to this subsection must be filed within one year of the date on which one of the following events occurs . . . (3) the complainant has notified a multichannel video programming distributor that it intends to file a complaint with the Commission based on a request for carriage or to negotiate for carriage of its programming on defendant's distribution system that has been denied or unacknowledged, allegedly in violation of one or more of the rules contained in this subpart.

*Id.* at 2676. Thus, as promulgated, subsection (f)(3) plainly applied only when an MVPD denied or refused to acknowledge a request to negotiate for carriage. The FCC does not dispute that the complaint in this case is untimely under the regulation as written in 1993. Br. for Resp'ts at 64. Therefore, if the Commission has never acted to modify the substance of the regulation since its promulgation in 1993 it follows *a fortiori* that Tennis Channel's complaint is untimely. A review of this regulation's history shows that the substance of subsection (f)(3) never has been amended by the Commission to give it the meaning that the agency now seeks to ascribe to it.

*1994 Amendment***:** In 1994, the FCC issued an order in response to an industry group petition for partial reconsideration of the Section 616 regulations. *See Implementation of the Cable Television Consumer Protection and Competition Act of 1992 Development of Competition and Diversity in Video Programming Distribution and Carriage* ("*1994 Amendment*"), Memorandum Opinion and Order, 9 FCC Rcd. 4415, 1994 WL 414309 (Aug. 5, 1994). The petitioners in that action "contend[ed] that Section

76.1302 . . . [was] too narrowly drafted because it [did] not specifically afford standing to file a complaint to any MVPD aggrieved by a violation of Section 616. Petitioners urge[d] the Commission to amend the scope of Section 76.1302 to affirmatively afford standing to file a complaint to any third party MVPD aggrieved by carriage agreements between other MVPDs and programming vendors that violate Section 616." *Id.* at 4416 ¶ 8. The FCC accepted the suggestion and amended several regulatory provisions to achieve the end sought. Subsection (f)(3) was edited in the following ways:

> Any complaint filed pursuant to this ~~subsection~~ **paragraph** must be filed within one year of the date on which one of the following events occurs . . . (3) ~~the complainant~~ **A party** has notified a multichannel video programming distributor that it intends to file a complaint with the Commission based on ~~a request for carriage or to negotiate for carriage of its programming on defendant's distribution system that has been denied or unacknowledged, allegedly in~~ violation**s** of one or more of the rules contained in this ~~subpart~~ **section**.

*Cable TV Act of 1992 – Development of Competition and Diversity in Video Programming; Distribution and Carriage*, 59 Fed. Reg. 43,776-01, 43,777-78 (Aug. 25, 1994) (strikethrough and emphasis added).

The language deleted from subsection (f)(3) was excised solely to avoid any suggestion that (f)(3) was meant to reference only complaints by video programmers. There is nothing in the Commission's 1994 action to suggest that the agency meant to make any substantive change to subsection (f)(3) beyond allowing for broader standing for MVPDs. Quite the contrary. The Memorandum Opinion and Order expressly states that the sole purpose of the regulatory edits was to afford standing to file a Section 616 complaint to any

third party MVPD aggrieved by carriage agreements between other MVPDs and programming vendors:

> The Commission has determined that it is in the public interest to grant [the] petition and to amend our implementing rules to specifically afford standing to MVPDs to file complaints under Section 616 of the 1992 Cable Act.

*1994 Amendment*, 9 FCC Rcd. 4418-19 ¶ 24. The FCC also stated that the same procedural rules would apply to complaints filed by MVPDs. *Id.* at 4419 ¶ 24 n.47 ("As noted in the [original implementation], a one-year statute of limitations will be applied to program carriage complaints.").

*1999 Order on Reconsideration*: Any questions about the meaning of subsection (f)(3) following the 1994 edits were answered in 1999. As part of its 1998 biennial regulatory review process, the Commission issued a Report and Order after notice and comment to "reorganize and simplify the Commission's Part 76 Cable Television Service pleading and complaint process rules." *1998 Biennial Regulatory Review – Part 76 – Cable Television Service Pleading and Complaint Rules*, Report and Order, 14 FCC Rcd. 418, 418 ¶ 1, 1999 WL 377764 (Jan. 8, 1999). The Commission subsequently issued an order denying a petition for reconsideration of these changes filed by EchoStar Communications Corporation. *1999 Order on Reconsideration*, 14 FCC Rcd. 16433. The order is relevant here because it carefully explains the statute of limitations for Section 616 complaints.

Tellingly, as can be seen in the block-quoted passage below, the Commission's 1999 Order on Reconsideration is directly contrary to the Commission's interpretation of 47 C.F.R. § 76.1302(f)(3) in this case:

The dispute resolution processes in Part 76 for program access, program carriage and open video system complaints follow similar procedural rules that were designed to achieve an expedient resolution of complaints. The rules contain three like provisions which set forth a one year limitations period for bringing complaints. The rules list three events that trigger the running of the limitations period: (1) complainant and defendant enter into a contract alleged to violate the rules; (2) unrelated to an existing contract, defendant makes an offer to complainant that allegedly violates the rules; or (3) <u>defendant unreasonably refuses to negotiate with complainant</u>. In the *Part 76 Order*, the Commission clarified the appropriate interaction between the limitations period for alleging an existing contract violates the rules and the limitations period for alleging that an offer to the complainant violates the rules. . . . The rules adopted in the *Part 76 Order* explain that complaints based on allegedly discriminatory contracts must be brought within one year of entering into the contract and that an allegedly discriminatory offer to amend such contract made more than one year after the execution thereof does not reopen such contract to program access liability. For example, in the program access context, this amendment explains that <u>an offer to amend an existing contract that has been in effect for more than one year does not reopen the existing contract to complaints that the provisions thereof are discriminatory</u>.

*Id.* at 16435-36 ¶ 5 (underlining added).

The 1999 Order on Reconsideration thus confirms that subsection (f)(3) applies only to refusals to negotiate for carriage and that proposals to amend a carriage contract do not reset the statute of limitations. This interpretation is

perfectly consistent with the regulations as promulgated by the Commission in 1993. It confirms that the 1994 edits to the statute of limitations were not intended to alter the substance of the third trigger, only the scope of who could pursue Section 616 complaints. And the parties have not directed us to any further embellishments or clarifications by the Commission of 47 C.F.R. § 76.1302(f). Indeed, before the decision in this case, the Commission seems never to have called into question the regulatory interpretation of subsection (f)(3) offered in 1993, 1994, and 1999.

*2008 Media Bureau Decisions*: As noted above, the Media Bureau rejected Comcast's statute-of-limitations defense on the pleadings and set the matter for a hearing on the merits before an ALJ. *The Tennis Channel, Inc. v. Comcast Cable Commc'ns LLC*, Hearing Designation Order, 25 FCC Rcd. 14149, 2010 WL 3907080 (Oct. 5, 2010). In so doing, the Media Bureau relied on two of its own decisions from 2008. In these earlier cases, the Media Bureau held that "Bureau precedent establishes that a complainant may have a timely program carriage claim in the middle of a contract term if the basis for the claim is an allegedly discriminatory decision made by the MVPD, such as tier placement, that the contract left to the MVPD's discretion." *Id.* at 14158 ¶ 15 (citing *NFL Enterprises LLC v. Comcast Cable Commc'ns, LLC*, Hearing Designation Order, 23 FCC Rcd. 14,787, 14820 ¶ 70 (Oct. 10, 2008); *MASN v. Comcast Corp.*, Hearing Designation Order, 23 FCC Rcd. 14,787, 14,834-35 ¶ 105 (Oct. 10, 2008)). Both cases settled before they were heard by an ALJ and without any appeal to or decision by the Commission. *See id.* at 14,156 ¶ 13 n.63.

These Media Bureau decisions are not controlling here because their reasoning was never affirmed by the Commission. And, most significantly, the two cited Media Bureau decisions are directly contrary the Commission's

interpretation of subsection (f)(3) that "an offer to amend an existing contract that has been in effect for more than one year does not reopen the existing contract to complaints that the provisions thereof are discriminatory." *1999 Order on Reconsideration*, 14 FCC Rcd. at 16436 ¶ 5.

As we explained in *Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008), this court follows the "well-established view that an agency is not bound by the actions of its staff if the agency has not endorsed those actions." It is true that "in the absence of Commission action to the contrary, the Media Bureau decisions have the force of law. 47 U.S.C. § 155(c)(3). But this simply means that those rulings are binding on the parties to the proceeding. . . . [U]nchallenged staff decisions are not Commission precedent . . . ." *Id.* at 770. Therefore, pursuant to the law of the circuit, it is quite clear that the 2008 Media Bureau decisions did not in any way disturb the FCC's settled treatment of 47 C.F.R. § 76.1302(f).

### 2. *The Commission's Changed Interpretation of 47 C.F.R. § 76.1302(f)*

This regulatory history shows that the FCC had never, until the Order on review, ascribed to the statute of limitations the meaning it now claims. And the Commission concedes that under its longstanding interpretation of 47 C.F.R. § 76.1302(f), which it has repeatedly articulated, Tennis Channel's complaint in this action is untimely.

Thus, there is much force to Comcast's assertion that it had no notice that the Commission would abruptly change its view of subsection (f)(3) in this case. The problem is compounded because the Commission's decision wholly fails to account for the 1999 Order on Reconsideration. The decision gives only a cursory response to Comcast's argument that the (f)(3) trigger concerns only refusals to deal or similar conduct, merely stating that

> we find no support for that view in the text. Comcast relies upon the fact that the rule was originally promulgated with this limitation. However, the Commission removed the limiting language in 1994, and there is no support for reading it back in notwithstanding its willful deletion.

*Order*, 27 FCC Rcd. at 8521 ¶ 32. This response is rather astonishing in light of the Commission's explanation of the 1994 edits to the regulation and the 1999 Order on Reconsideration. As noted above, the Commission made it clear that the 1994 edits were intended solely to avoid any suggestion that subsection (f)(3) was meant to reference only complaints by video programming vendors. And in 1999, the Commission confirmed that the (f)(3) trigger relates to situations in which a "defendant unreasonably refuses to negotiate with [a] complainant," nothing more. *1999 Order on Reconsideration*, 14 FCC Rcd. at 16435 ¶ 5.

The FCC simply ignores this regulatory history, obviously because it cannot be squared with the Commission's current interpretation of the applicable regulation. A court need not defer to an agency's interpretation of a disputed regulation when an alternative reading is compelled by "indications of the [agency's] intent at the time of the regulation's promulgation." *Thomas Jefferson Univ*, 512 U.S. at 512. This principle controls the disposition of this case, for it is undisputed that the Commission's current interpretation of the regulation flies in the face of the agency's intent at the time of promulgation of 47 C.F.R. § 76.1302(f).

### 3. *Subsection (f)(1) Prescribes the Applicable Statute of Limitations in This Case*

Under subsection (f)(1), the one-year statute of limitations begins running when an MVPD "enters into a

contract with a video programming distributor that a party alleges to violate [Section 616 and its implementing regulations]." 47 C.F.R. § 76.1302(f)(1). The Commission held that subsection (f)(1) was inapplicable here because "Tennis Channel was not trying to demand a unilateral change in the existing terms of its contract with Comcast; it was asking that the existing contract be performed – that Comcast exercise its contractual discretion – consistent with its obligations under Section 616." *Order*, 27 FCC Rcd. at 8521 ¶ 33. This is a perplexing statement, bordering on oxymoronic.

Under the terms of the carriage contract, Comcast retains the unfettered right to carry Tennis Channel on a distribution tier of Comcast's own choosing. Neither Tennis Channel nor the Commission argues that Tennis Channel retained an affirmative right under the contract to demand that Comcast reconsider its distribution tier. Instead, they argue that Comcast's right to assign Tennis Channel to a tier of its choosing is somehow tantamount to Tennis Channel's right to demand that Comcast revisit its initial exercise of that choice. The FCC's Order elides this distinction, reasoning that because Comcast could have reassigned Tennis Channel it was under an obligation to consider Tennis Channel's proposal. But nothing in the parties' contract supports this view. Therefore, in demanding "that Comcast exercise its contractual discretion" to reassign Tennis Channel to a different tier, Tennis Channel was simply insisting on a material change in the contract's terms. Subsection (f)(1) thus clearly applies, meaning that Tennis Channel's claim became time-barred in 2006.

The FCC argues that if it is required to adhere to its original and longstanding interpretation of 47 C.F.R. § 76.1302(f)(3) "a programming network effectively would be barred from complaining about any carriage-related

discrimination occurring more than one year after the execution of its contract." Br. for Resp'ts at 67. One need only consider the record in this case to see that this is a shallow argument. Tennis Channel was in the same position relative to the affiliated Golf Channel and Versus networks in 2010 as it was in 2005. That is, Tennis Channel was on a lower tier than the other two networks in 2005 when it negotiated the contract affording Comcast unfettered authority as to its placement and remained so in 2010. Tennis Channel argues that circumstances had changed by 2010 because its "quality and performance" had improved since entering into the contract. Compl. at i. This argument is a classic *non sequitur*, however, because the parties' contract does not require Comcast to take into account "quality and performance" in deciding whether to distribute Tennis Channel more broadly.

Most importantly, the parties' agreement does not in any way suggest, as the Commission held, that Comcast is obliged to "exercise its contractual discretion" in considering whether to reassign Tennis Channel to a different tier. Indeed, the word "discretion" does not even appear in the contract provision that Tennis Channel and the FCC cite. Tennis Channel introduced this term in its briefing and the Commission attempts to read it into the carriage agreement to abrogate Comcast's lawful contract rights. The truth is that the parties' contract simply confirms that Comcast has the sole and unfettered authority to determine the tier placement of Tennis Channel. By demanding that Comcast revisit its concededly lawful initial decision and consider placing it on the same tier as Golf Channel and Versus, Tennis Channel sought to reopen the contract. And, because this demand was nothing more than "an offer to amend an existing contract that has been in effect for more than one year," *1999 Order on Reconsideration*, 14 FCC Rcd. at 16436 ¶ 5, it "does not

reopen the existing contract to complaints that the provisions thereof are discriminatory," *id.*

Furthermore, Tennis Channel's rights would not be so harmed by this outcome as the FCC suggests. Because most businesses hope to become more successful over time, Tennis Channel could have anticipated in 2005 that, at some point in the future, it might prefer placement on a more widely distributed tier. Therefore, when the carriage contract was formed, Tennis Channel could have bargained for a provision to increase its distribution contingent upon improvements to its "quality and performance." If Comcast had declined such terms on the basis of its nonaffiliation with Tennis Channel, that might have given rise to a Section 616 complaint under the existing regulations.

Instead, it is Comcast's contract rights that were completely disregarded by the Commission's actions in this case. Section 616 simply does not sanction what the Commission proposes to do here. The Commission may now be of the view that the controlling construction of subsection (f)(3) that it embraced in 1993, 1994, and 1999 is unsatisfactory because it may not account for some situations in which a party commits a violation of Section 616 that is unrelated to its lawful contractual commitments. But if that is so, then the FCC may amend subsection (f)(3) pursuant to notice-and-comment rulemaking, not by fiat in an adjudicatory action in which a party had no prior notice of the rule that the Commission seeks to enforce.

It is unnecessary to consider this possibility, however, because it is not properly before us. The bottom line here is that, under the Commission's established construction of 47 C.F.R. § 76.1302(f), the statute of limitations began to run under subsection (f)(1) in 2005, not under subsection (f)(3) in 2009. As a result, Tennis Channel's complaint was out of time and should have been dismissed.

#### 4.  *The Commission's Laches Argument*

The Commission seemingly understood that its position made little sense, especially in light of the precedent established by its 1993, 1994, and 1999 orders. To compensate for the obvious weaknesses in its decision, the Commission layered a *new* rule of "laches" onto the requirements of subsection (f)(3). Pursuant to this further amendment of the statute of limitations, the Commission stated:

> [W]e read subsection 76.1302(f)(3) consistent with the doctrine of laches to impliedly require notification of an intent to file a complaint within a reasonable time period of discovery of the allegedly unlawful conduct. Because the allegedly unlawful conduct at issue here occurred within one year of the filing of the complaint, we need not determine precisely what period of time would be "reasonable" here.

*Order*, 27 FCC Rcd. at 8520 ¶ 30 n.105. Comcast justly objects to this unexpected and largely incomprehensible new rule of laches:

> [T]his *further* rewriting of the limitations regulation, to add a malleable [laches] exception whose scope is known only to the FCC, only compounds the uncertainty that its interpretation produces.
>
> The Order also does not attempt to explain how Tennis Channel satisfied its new laches requirement here. Nor could it, given that Tennis Channel has known since 2005 that Comcast carried Golf Channel and Versus broadly, but did not file its complaint until 2010. . . .
>
> Under any reasonable application of laches, this deliberate, unexcused delay should have resulted in the dismissal of the complaint. The Order avoids that result

> only by characterizing the evidence of Tennis Channel's strategic conduct as irrelevant to the timeliness of its complaint. But it is arbitrary for the Order both to assert that its interpretation of the statute of limitations is backstopped by a "reasonable time" requirement, and to ignore the evidence that Tennis Channel, without basis, sat on its claim for years before bringing suit.

Br. for Pet'r at 60-61.

The Commission's invocation of "laches" is also patently at odds with its claim that the terms of subsection (f)(3) plainly require the result reached in this case. The Commission suggests that the (f)(3) trigger applies straightforwardly within one year after a complaining party gives notice that it intends to file a complaint. But if this were so clear, there would be no need for a rule of laches. The Commission instead acknowledges that subsection (f)(3) is confusing under its present view of the regulation because "[t]he third trigger does not specify precisely what impermissible conduct starts the clock." *Order*, 27 FCC Rcd. at 8520 ¶ 30. The Commission's Order relies in part on a 2011 Notice of Proposed Rulemaking, in which the agency acknowledged that the terms of subsection 76.1302(f) are ambiguous and announced its intention to amend it for clarity. *Id.* at 8520 ¶ 30 n.105 (citing *In re Revision of the Commission's Program Carriage Rules*, Notice of Proposed Rulemaking, 26 FCC Rcd. 11494, 11522-23, ¶¶ 38-39, 2011 WL 3279328 (Aug. 1, 2011)). The Commission's position here is thus amusing, to say the least: in the Order under review, the Commission suggests that (f)(3) is clear if overlaid with a *new* rule of laches; and yet, in the very same footnote, the Commission cites to a Rulemaking initiated for the purpose of resolving that subsection's ambiguity. *Id.* The truth of the matter is that the Commission's current position on the meaning of subsection (f)(3) is hopelessly confused

and far removed from the regulatory interpretations that it espoused in 1993, 1994, and 1999.

## C. The Commission's Action in This Case Defies the APA and Requirements of Fair Notice

What is obvious here is that the FCC is essentially trying to rewrite its regulations without following the applicable notice-and-comment procedures required by the APA. The Commission may now be of the view that the controlling construction of subsection (f)(3) that it embraced in 1993, 1994, and 1999 is unsatisfactory because it may not account for some situations in which a party commits a violation of Section 616 that is unrelated to its lawful contractual commitments. But if that is so, then the FCC must amend subsection (f)(3) pursuant to notice-and-comment rulemaking, not by fiat in an adjudicatory action in which a party had no prior notice of the rule that the Commission seeks to enforce. *See generally* HARRY T. EDWARDS, LINDA A. ELLIOTT & MARIN K. LEVY, FEDERAL STANDARDS OF REVIEW § XIII.E (2d ed. 2013) (discussing the requirements of "fair notice").

The court carefully explained this principle in *Alaska Professional Hunters Association*:

> Our analysis . . . draws on *Paralyzed Veterans of America v. D.C. Arena*, 117 F.3d 579, 586 (D.C. Cir. 1997), in which we said: "Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." We there explained why an agency has less leeway in its choice of the method of changing its interpretation of its regulations than in altering its construction of a statute. "Rule making," as defined in the APA, includes not only the agency's process of formulating a rule, but also the agency's process of

modifying a rule. 5 U.S.C. § 551(5). *See Paralyzed Veterans*, 117 F.3d at 586. When an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94-95 (D.C. Cir. 1997), is to the same effect: a modification of an interpretive rule construing an agency's substantive regulation will, we said, "likely require a notice and comment procedure."

177 F.3d at 1033-34; *see also SBC Inc. v. FCC*, 414 F.3d 486, 498 (3d Cir. 2005) ("[I]f an agency's present interpretation of a regulation is a fundamental modification of a previous interpretation, the modification can only be made in accordance with the notice and comment requirements of the APA."); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 (5th Cir. 2001) ("[T]he APA requires an agency to provide an opportunity for notice and comment before substantially altering a well established regulatory interpretation.").

The Supreme Court recently reinforced this point in *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2167 (2012), there holding that an agency is obliged to "provide regulated parties fair warning of the conduct [a regulation] prohibits or requires." It follows, therefore, that an agency cannot change its interpretation of a regulation so as to cause "unfair surprise" to regulated parties. *Id.*; *see also FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) ("A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."). Yet, in failing to provide any notice to MVPDs about how and when they may be subject to Section 616 claims, the FCC's actions

against Comcast in this case constitute exactly that kind of "unfair surprise."

In sum, the limitations period under 47 C.F.R. § 76.1302(f)(3) does not apply here because the Commission has consistently held that the (f)(3) trigger is applicable only in situations when an MVPD denies or refuses to acknowledge a request to negotiate for carriage. Tennis Channel's complaint does not include any such claim. Indeed, Tennis Channel, not Comcast, terminated discussions between the parties in 2009. Neither Comcast's refusal to reassign Tennis Channel to a more broadly distributed tier nor Tennis Channel's notice of its intention to file a Section 616 complaint triggered a new statute of limitations period under 47 C.F.R. § 76.1302(f)(3). Under the FCC's governing regulations, "an offer to amend an existing contract that has been in effect for more than one year does not reopen the existing contract to complaints that the provisions thereof are discriminatory." *1999 Order on Reconsideration*, 14 FCC Rcd. at 16436 ¶ 5. The reason for the FCC's rule is clear: to allow a video programming vendor to restart an expired limitations period simply by asking to negotiate a better deal under an existing agreement would render meaningless the limitations period in subsection (f)(1).

It is undisputed that the complaint was filed more than one year after Comcast and Tennis Channel entered into their carriage contract. The contract was executed in 2005 and the limitations period under 47 C.F.R. § 76.1302(f)(1) expired one year later. Tennis Channel's complaint simply alleges that Comcast's continued carriage pursuant to the terms of the 2005 agreement is discriminatory. Therefore, the complaint is almost four years late and should be dismissed as time-barred.